989 A.2d 1150

**Charles F. MOORE, Jr.**

v.

**STATE of Maryland.**

**No. 27, Sept. Term, 2009.**

Court of Appeals of Maryland.

Feb. 26, 2010.

636

638

Michael G. Pattillo, Jr. (Caleb S. Fox of Baker Botts L.L.P., Washington, DC), on brief, for petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BELL, C.J.

This case presents the issue of whether a Defense Witness question is mandatory i.e., whether a "trial court [must] ask potential jurors on *voir dire* whether they would tend to view the testimony of witnesses called by the defense with more skepticism than that of witnesses called by the State, merely because they were called by the defense[.]" In *Bowie v. State,* having concluded that it is "necessary to determine whether witnesses called by the State will start with a 'presumption of credibility' simply because of the positions occupied rather

than the facts of the case," this Court held that the trial court erred when it refused to ask the Defense–Witness question requested by the defendant in an attempt to determine whether any venireperson was so inclined. 324 Md. 1, 10, 595 A.2d 448, 452 (1991). We now shall hold that *Bowie* controls the resolution of this case, and, consequently, that the trial court erred when it failed, upon the defendant's request, to ask the Defense–Witness question during *voir dire.* This holding is consistent with the well settled principle that questions designed to, and that will, uncover bias that would undermine a defendant's right to a fair trial are mandatory and, thus, must, if requested, be asked on *voir dire.*

**I.**

Just before midnight, on May 20, 2005, Charles F. Moore Jr., ("the petitioner") and a group of two men and two women were in a parking lot near Country Hills Apartments ("Country Hills") in Frederick, Maryland. The petitioner was wearing a Pittsburgh Steelers jersey with the number "12." He and his companions were preparing to leave in the petitioner's Lincoln Towncar when a Ford Taurus, driven by Alicia Bowens ("Bowens") and in which Romell Allen ("Allen"), Reginald Cobb ("Cobb"), and Devon Henderson ("Henderson") were passengers, drove by. Subsequently, the passengers in the Taurus and the petitioner's group became embroiled in a verbal and possibly physical exchange. Although each group initially departed, gunshots soon followed and Allen was hit and seriously wounded.

Having been identified by witnesses as the shooter, on June 20, 2005, the petitioner was indicted in the Circuit Court for Frederick County, Maryland. In the indictment, he was charged with two counts of attempted first degree murder, five counts of first degree assault, five counts of use of a handgun in commission of a crime of violence, five counts of reckless endangerment, and one count of wearing, carrying and transporting a handgun. The petitioner pleaded not guilty and prayed a jury trial.

Before jury selection, the petitioner's counsel submitted a list of the questions he requested the court to ask the venire on *voir dire.* Among the questions were the following:

"21. Would any prospective juror be more likely to believe a witness for the prosecution merely because he or she is a prosecution witness?

"22. Would any prospective juror tend to view the testimony of a witness called by the defense with more skepticism than witnesses called by the State, merely because they were called by the defense?

"23. Would any prospective juror be more or less likely to believe a police officer than a civilian witness, solely because he or she is a police officer?"

While all three questions purported to be designed to uncover juror bias, the former two specifically were directed at uncovering bias against the witnesses for the defense.

The court agreed that question 23 was a proper *voir dire* question and should be asked. Over defense counsel's objection, however, the court declined to ask either question 21 or 22, ruling:

"THE COURT: 21 and 22, I believe is also covered generically. We talk about it in 23 as to believe the testimony. I don't like to stress prosecution over are less likely to believe defense witness because that's again covered, I believe, in other instructions."

During the petitioner's three-day jury trial, the State called fifteen (15) witnesses including Allen, the victim, Bowens and Henderson, the two women in the Taurus, Michelle Atwood, an alleged eyewitness and Sergeant Wayne Trapp ("Sgt. Trapp"), the officer who apprehended the petitioner. Sgt. Trapp, a member of the Frederick Police Department's Drug Enforcement unit, was one of several such members of that unit doing undercover surveillance at County Hills at the time of the shooting. Sgt. Trapp testified that he saw the petitioner

"right in the middle of the parking lot, right around here, and he was pointing at another group of people somewhere

over here. I was kind of directly behind him. He was crouched, holding the handgun with two hands, firing shots at some individuals...."

Sgt. Trapp testified that he called for back-up and pursued the shooter on foot. The chase ended, he said, when a police car pulled in front of the petitioner. Each of the other witnesses gave varying accounts of what happened. On one thing they all agreed, each witness's testimony implicated the petitioner as the shooter.

The petitioner testified on his own behalf and asserted his innocence. Indeed, the petitioner maintained his innocence through out the trial. Responding to Sgt. Trapp, he stated that he went to the ground in an effort to comply with the police officers' request to "put his arms up," after which the officers handcuffed him and took him into custody. The petitioner testified further that he was "surprised" to learn he was under arrest because he did not have a gun and was not the shooter. The petitioner also called as a witness a bystander who stated he observed a man with a bandana "running across the street ... and duck[ing] down behind [his] car."

The jury acquitted the petitioner of three counts of first degree assault and the related counts of use of a hand gun in the commission of a crime of violence. It convicted him of two counts of attempted first degree murder, two counts of first degree assault, two counts of use of a handgun in commission of a crime of violence, five counts of reckless endangerment, and one count of wearing, carrying and transporting a handgun. His motion for new trial having been denied, the petitioner was sentenced to twenty years (20) for the reckless endangerment counts, and the use of handgun counts, to be served consecutively with two concurrent life sentences for the attempted murder counts. On appeal, the Court of Special Appeals affirmed the petitioner's conviction, after which this Court granted the petitioner's petition for writ of certiorari, *Charles F. Moore, Jr. v. State of Maryland*, 408 Md. 149, 968 A.2d 1064 (2009), to address this important issue.

## II.

▮ The principles governing *voir dire* are well-established. *Wright v. State*, 411 Md. 503, 506–508, 983 A.2d 519, 521–522 (2009); *Stewart v. State*, 399 Md. 146, 158–160, 923 A.2d 44, 51–52 (2007); *Curtin v. State*, 393 Md. 593, 600–607, 903 A.2d 922, 926–930 (2006); *Langley v. State*, 281 Md. 337, 340–342, 378 A.2d 1338, 1339–1340 (1977); *Casey v. Roman Catholic Archbishop of Baltimore*, 217 Md. 595, 605–606, 143 A.2d 627, 631 (1958). This Court in *Dingle v. State*, explained:

"Voir dire, the process by which prospective jurors are examined to determine whether cause for disqualification exists, see *Boyd v. State*, 341 Md. 431, 435, 671 A.2d 33, 35 (1996), is the mechanism whereby the right to a fair and impartial jury, guaranteed by Art. 21 of the *Maryland Declaration of Rights*, ... see *Grogg v. State*, 231 Md. 530, 532, 191 A.2d 435, 436 (1963), is given substance. See *Hill v. State*, 339 Md. 275, 280, 661 A.2d 1164, 1166 (1995); *Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111, 116 (1989). The overarching purpose of voir dire in a criminal case is to ensure a fair and impartial jury. *See Boyd*, 341 Md. 431, 435, 671 A.2d 33, 35 (1996); *Hill*, 339 Md. 275, 279, 661 A.2d 1164, 1166 (1995); *Davis v. State*, 333 Md. 27, 34, 633 A.2d 867, 871 (1993); *Bedford*, 317 Md. 659, 670, 566 A.2d 111, 117 (1989); *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627, 631 (1958); *Adams v. State*, 200 Md. 133, 140, 88 A.2d 556, 559 (1952)."

361 Md. 1, 9, 759 A.2d 819, 823 (2000); *see State v. Thomas*, 369 Md. 202, 206–207, 798 A.2d 566, 568–569 (2002). In the absence of a statute or rule prescribing the questions to be asked of the venirepersons during the examination, "the subject is left largely to the sound discretion of the court in each particular case." *Corens v. State*, 185 Md. 561, 564, 45 A.2d 340, 343 (1946); *see also Langley*, 281 Md. at 341, 378 A.2d at 1340. Thus,

" 'the broad rule [is] that any circumstances which may reasonably be regarded as rendering a person unfitted for jury service may be made the subject of questions and a

challenge for cause. In other words, an examination of a prospective juror on his *voir dire* is proper as long as it is conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.' "

*Corens,* 185 Md. at 564, 45 A.2d at 343. The court, however, must adapt the questions to the particular circumstance or facts of the case, the ultimate goal, of course, being to obtain jurors who will be "impartial and unbiased." *Dingle,* 361 Md. at 9, 759 A.2d at 824 (quoting *Waters v. State,* 51 Md. 430, 436 (1879)). These tenets guide our discussion and the result.

**III.**

*Langley* provides context for the *Bowie v. State,* 324 Md. 1, 595 A.2d 448 (1991) decision, which, along with the *Langley* analysis and the standard emanating from that analysis, logically, will guide our discussion in this case. At first glance the holding in *Langley* may be viewed, and interpreted as, limited to witnesses who are police officers. A brief recitation of the facts and review of the Court's analysis demonstrate that it has a broader application.

Lawrence Langley was arrested for stealing a taxicab and subsequently charged with, and tried for, robbery. *Langley,* 281 Md. at 338, 378 A.2d at 1338–39. During jury selection, the trial judge refused to ask the following question of the venire:

"Is there anyone here who would give more credit to the testimony of a police officer over that of a civilian, merely because of this status as a police officer?"

*Id.* at 338, 378 A.2d at 1338. Langley was convicted and he appealed. *Id.* at 338, 378 A.2d at 1338. The Court of Special Appeals affirmed his conviction. *Id.* This Court, however, reversed the judgment of that court and remanded the case for the Circuit Court to conduct a new trial. *Id.* at 349, 378 A.2d at 1344. In considering the matter, the *Langley* Court began its analysis, as we have done in this case, by setting out the principles which undergird *voir dire. Id.* at 340-2, 378

A.2d at 1339–40. Of particular importance to this discussion, the Court emphasized:

"[P]arties to an action triable before a jury have a right to have questions propounded to prospective jurors on their *voir dire*, which are directed to a specific cause for disqualification, and failure to allow such questions is an abuse of discretion constituting reversible error." (emphasis omitted).

*Id.* at 341–342, 378 A.2d at 1340, (quoting *Casey*, 217 Md. at 605, 143 A.2d at 631). The questions, of course, must be relevant to the case. *Id.* at 342, 378 A.2d at 1340.

Although a case of first impression at the time in Maryland, to conclude that the court's refusal to ask the requested *voir dire* questions was error, the Court considered similar cases from other jurisdictions. These cases revealed that there pre-existed strong support for a trial court's inquiry, during *voir dire*, into whether a venireperson would give more weight to the testimony of a police officer. In *Sellers v. United States*, for example, a narcotics case, the appellate court held that the trial court erred in declining "to make inquiry on *voir dire* as to whether any of the prospective jurors were 'inclined to give more weight to the testimony of a police officer merely because he was a police than any other witness in the case.'" *Langley*, 281 Md. at 342, 378 A.2d at 1341 (quoting, *Sellers*, 271 F.2d 475, 476 (D.C.Cir.1959)); *see also Chavez v. United States*, 258 F.2d 816, 819 (10th Cir.1958) (stating "a defendant cannot be fairly tried by a juror who would be inclined to give unqualified credence to a law enforcement officer simply because he is an officer.").

But the cases also revealed that their concern and, therefore, their support was not directed only to situations where the witness was a police officer, that their reach was not nearly so narrow.

Faced with the issue again, under "very similar circumstances," the United States Court of Appeals for the D.C. Circuit, in *Brown v. United States*, 338 F.2d 543 (1964), heavily relied on its previous decision in *Sellers*. It opined:

"The circumstances of the *Sellers* case are very similar and compel reversal here; moreover, we do not read *Sellers* as having been narrowly decided. We construe that case as establishing that when important testimony is anticipated from certain categories of witness, whose *official* or *semi-official* status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested.

\* \* \*

"We hold that under the *Sellers* case failure to inquire of the jury panel as requested regarding possible predilections concerning police testimony was reversible error in this case. We emphasize that independent of the scope of the requested query, the phrasing of the court's inquiry should include whether any juror would tend to give either more or less credence because of the occupation or category of the prospective witness."

*Brown,* 338 F.2d at 545 (emphasis added); *see also United States v. Martin,* 507 F.2d 428 (7th Cir.1974); *United States v. Brewer,* 427 F.2d 409, 410 (10th Cir.1970).

*Martin* did not concern police officers at all. Rather, it was a case concerning failure to file taxes, where at issue was the propriety of the trial court's refusal to inquire into whether the venire would favor the testimony of a government agent over other witnesses. *Martin,* 507 F.2d at 429. The Court held that inquiry was required; it was necessary to inquire as to whether a venireperson felt "that because a witness is a Government Agent that his testimony is therefore entitled to more weight than one who is not an agent?" *Id.* at 429, 432, n. 6. As the court put it:

"Of the four witnesses called by the United States, three were employees of government agencies. Thus, it was particularly important for the defendant to know of any prejudices the jurors may have had about the Government or about the credibility of government agents. Specifically,

we think question 9 concerning the weight that would be given a government agent's testimony was particularly important. See *Chavez v. United States,* 258 F.2d 816, 819 (10th Cir.1958)."

*Id.* at 432. Also following and relying on *Brown,* the court in *Commonwealth v. Futch,* 469 Pa. 422, 366 A.2d 246 (Pa.1976), reached the same conclusion with regard to prison guards. Addressing the issue, the court stated:

"The crux of the case at bar is the credibility of the prison guards' testimony contrasted to the credibility of the prison inmates' testimony. On these facts a juror who would believe the testimony of a prison guard simply because of his official status would be subject to disqualification for cause. Appellant has a right to probe for this bias since it bears on a juror's objectivity with respect to the most critical aspect of the case. *See United States v. Napoleone,* 349 F.2d 350 (3d Cir.1965).

\* \* \*

"The rationale underlying *Brown v. United States, supra,* is that although it is likely that jurors might believe testimony of law enforcement officials solely by virtue of the group's official status, it is unreasonable for them to do so because official status is no guarantee of trustworthiness. With regard to prison inmates, it is just as likely that jurors might attach less credit to their testimony, and it is just as unreasonable for them to do so because prior criminal activity is not necessarily a reliable indicator of untrustworthiness. On the facts of this case a juror who would disbelieve the testimony of a prison inmate simply because of his status as a prison inmate would be subject to disqualification for cause."

*Id.* at 430–31. (footnotes omitted).

After reviewing these cases from its sister jurisdictions and conducting its own analysis, the *Langley* Court concluded:

"A juror who states on *voir dire* that he would give more credit to the testimony of police officers than to other persons has prejudged an issue of credibility in the case.

Regardless of his efforts to be impartial, a part of his method for resolving controverted issues will be to give greater weight to the version of the prosecution, largely because of the *official status* of the witness. The argument by the State that police officers are entitled to greater credibility because they have less interest in the outcome of the case is not sufficient to overcome such an objection. "As Judge Horney pointed out for the Court in *Casey v. Roman Catholic Arch.*, 217 Md. 595, 607, 143 A.2d 627, 'a party is entitled to a jury free of all disqualifying bias or prejudice without exception, and not merely a jury free of bias or prejudice of a general or abstract nature.' Accordingly, we hold that in a case such as this, where a principal part of the State's evidence is testimony of a police officer diametrically opposed to that of a defendant, it is prejudicial error to fail to propound a question such as that requested in this case. However, in the words of *Brown*, we suggest that 'the phrasing of the court's inquiry should include whether any juror would tend to give either more or less credence [merely] because of the *occupation* or *category* of the prospective witness.' "

*Langley*, 281 Md. at 348–349, 378 A.2d at 1344 (emphasis added). Thus, it is apparent that the *Langley* Court, from the outset, understood that, although it was addressing police officer credibility and, thus, some of the cases were not directly on point, the underlying issue of prejudgment encompassed more than police officers, that many more occupations and categories potentially were implicated. To be sure, it was the nature of the issue and who the witnesses were that would determine which questions, about which occupations and categories, had to be asked to uncover prejudicial or disqualifying bias.

The principles prescribed and enunciated by *Langley* and embodied in its holding cannot be, as we have seen, so narrowly interpreted or applied to police officers. At its core, the *Langley* Court's holding is that it is grounds for disqualification for a juror to presume that one witness is more credible than another simply because of that witness's status or affilia-

tion with the government. *Langley*, 281 Md. at 349, 378 A.2d at 1344. Such juror bias, the Court reasoned, adversely impacts the defendant's ability to obtain a fair and impartial trial. *See Id.* at 340, 378 A.2d at 1339–40. In reaching its holding, *Langley* reiterated the well settled proposition that *voir dire* is a process during which the parties at interest, through examination of the venirepersons, seek to uncover any bias that a venireperson might harbor. 281 Md. at 348–49, 378 A.2d at 1343–44. To achieve that result, to be able to do so, any proposed question related to the facts of the case, designed to uncover such bias, is directed to a specific cause for disqualification and, therefore, must be asked. *Id.* at 341–2, 378 A.2d. at 1340 (quoting *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627, 631 (1958)) ("Parties to an action triable before a jury have a right to have questions propounded to prospective jurors on their *voir dire*, which are directed to a specific cause for disqualification, and failure to allow such questions is an abuse of discretion constituting reversible error.") (citation and emphasis omitted). It is true, in *Langley*, the issue of juror bias because of prejudgment was specific to police officers:

> "Accordingly, we hold that in a case such as this, where a principal part of the State's evidence is testimony of a police officer diametrically opposed to that of a defendant, it is prejudicial error to fail to propound a question such as that requested in this case."

*Id.* at 349, 378 A.2d at 1344. It is also true that the bias inherent in prejudgment is not unique to police officers, a fact emphasized by *Brown*, a case on which *Langley* particularly relied. Thus *Langley*, appropriately observed and instructed:

> "However, in the words of *Brown*, we suggest that 'the phrasing of the court's inquiry should include whether any juror would tend to give either more or less credence [merely] because of the *occupation or category* of the prospective witness.'" (emphasis in *Brown*).

*Id.* (emphasis added)

*Bowie* is simply an explication and application of the standard acknowledged and even enforced in *Langley*. In that

regard, it articulated expressly that the issue suggested by the police witness question is broader than those witnesses and, therefore, has a relevance beyond cases involving police officers.

In *Bowie,* the defendant, Damon Alejandro–Christopher Bowie, and four accomplices, committed an armed robbery, which resulted in two fatalities and injuries to several other persons. *Bowie,* 324 Md. at 4, 5–6, 595 A.2d at 449, 451. Bowie was convicted by a jury in the Circuit Court for Prince George's County of two counts of: "first degree murder; attempted murder; assault with intent to murder; malicious shooting; and robbery with a deadly weapon." *Id.* at 4, 595 A.2d at 449. Following a capital sentencing proceeding, Bowie was sentenced to death for each of the first-degree murder convictions and to 120 years of incarceration as consequence of the other convictions. *Id.* Bowie raised 12 issues on appeal, four of which the Court considered.[1] One of those four issues—"Did the trial court err in refusing to propound *voir dire* questions designed to identify jurors who would give more weight to the testimony of police officers than civilians or to State's witnesses and defense witnesses?," *id.* at 5, 595 A.2d at 450—is of particular relevance to this case.

Arguing that they were encompassed within the broad *voir dire* question that this Court granted certiorari to consider, Bowie asked that the trial court include the following three questions in the *voir dire* examination:

---

1. The four issues the *Bowie* Court addressed were:

 "1. Did the trial court err in refusing to propound *voir dire* questions designed to identify jurors who would give more weight to the testimony of police officers than civilians or to State's witnesses and defense witnesses?

 "2. Did the trial court err in refusing to propound a requested *voir dire* question relating to the possible racial bias of the prospective jurors?

 "3. Did the trial court conduct an inadequate jury selection procedure with respect to the views of the prospective jurors on the death penalty?

 "4. Did the trial court err in its sentencing-phase instructions to the jury?"

 *Bowie v. State,* 324 Md. 1, 5, 595 A.2d 448, 450 (1991).

"1. Many of the State's witnesses will be police officers. Do you believe that a police officer will tell the truth merely because he or she is a police officer?

"2. Would any of you be more or less likely to believe a police officer than a civilian witness, solely because he or she is a police officer?

"3. Would any of you tend to view the testimony of witnesses called by the Defense with more skepticism than witnesses called by the State, merely because they were called by the Defense?"

*Bowie,* 324 Md. at 6, 595 A.2d at 450. Over defense counsel's objection, the trial court declined to include or incorporate those questions. In its case, the State called several police officers "to testify in their official capacity" and the "victims, all but one of whom . . . had no official position." *Id.* at 7, 595 A.2d at 451. Although Bowie did not testify on his own behalf, he called two witnesses—a "custodian for the records" of the hospital where one of the victims had been attended, *id.* and a police officer, who testified with regard to the defendant's line-up. *Id.*

On appeal, Bowie argued that the trial court's refusal to ask the three questions he proposed "was prejudicial error, necessitating reversal and remand for a new trial." *Id.* at 6, 595 A.2d at 450. This Court agreed, holding "that the trial court erred in refusing to address in *voir dire* the issue raised by the three questions proposed by appellant and that the error was not harmless beyond a reasonable doubt." *Id.* at 11, 595 A.2d at 453. To reach that result, the *Bowie* Court relied on *Langley v. State,* 281 Md. 337, 378 A.2d 1338 (1977), and, indeed, stated that the outcome of the case and its holding were dictated by *Langley. Bowie,* 324 Md. at 8, 595 A.2d at 451.

At the heart of the issues presented in *Langley, Bowie* and the case at bar is whether it is appropriate for a juror to give "credence" to a witness simply because of that witness's "occupation," or status, or "category," or affiliation. *Langley,* 281 Md. at 349, 378 A.2d 1338, 1344. In *Langley,* in the

context of police officer testimony, we first held that it was not. The requested *voir dire* questions in *Bowie* were of both varieties, occupational, or status-based, inquiring about preferences for police officer testimony, and categorical, or affiliational, inquiring whether the venire preferred the testimony of witnesses testifying for one side as opposed to the other. In *Bowie*, we recognized, as *Langley* had done, albeit more generally, that favoring a witness on the basis of that witness's category or affiliation poses the same threat to the defendant's right to a fair and impartial trial as favoring a witness on the basis of occupation or status; in other words, we were clear, there is not just one way that prejudgment could manifest. *Bowie*, 324 Md. at 8–9, 595 A.2d at 451. On this point, we not only were clear, but we were emphatic: having identified the dichotomies the *voir dire* questions required to be considered—"(1) those who would believe police officers, simply because they were police officers, and (2) those who would prefer the testimony of State's witnesses over defense witnesses"—we noted that

"[i]n the first category, a further dichotomy is possible, between those who would simply believe police officers by virtue of the position without regard to testimony from anyone else and those who would believe the police officers in comparison to civilian witnesses."

*Id.* at 7–8, 595 A.2d at 451. The *Bowie* Court, in short, recognized that prejudgment bias is neither exclusively status nor affiliation-based, that either or both could exist in a given case, with an identical effect on the fair trial right. It also stated explicitly what this Court's jurisprudence earlier had recognized, that status-based bias may manifest in situations other than those involving police officers, but may also exist with regard to non-official (non-police) witnesses called by the State. Such bias may be harbored toward or against such witnesses. This is so, we said, because, notwithstanding whether the witness is official or non-official, the effect of bias is identical to those, as made clear in *Langley*, applicable to police officers. The same analysis was applied to, and the identical conclusion drawn as to, bias based on the category or

affiliation of the witness. Any juror, *Bowie* concluded, who would give one witness's testimony greater weight than another may be prejudiced, because he or she has prejudged the case, and that jeopardizes a defendant's right to a fair and impartial trial.

■ Maryland law has made clear that if a question is "directed to a specific cause for disqualification" then the question must be asked and failure to do so is an "abuse of discretion." *See Casey,* 217 Md. at 605, 143 A.2d at 631. At issue in *Bowie,* and in *Langley* before it, was whether the *voir dire* question rejected by the trial judge was one designed, and intended, to uncover bias, which, if overlooked, might adversely impact the defendant's right to a fair and impartial trial. The *Bowie* Court concluded that the questions did, in fact, "[fall] within the subjects of inquiry." *Bowie,* 324 Md. at 8, 595 A.2d at 451. Specifically, as to the Defense Witness question, *albeit* in the context of the harmless error analysis, we observed:

> "Moreover, to the extent that the State relies upon non-official witness testimony or the other police witnesses to corroborate McDaniels' testimony, it overlooks question No. 3. That question is designed to discover those who would give greater weight to the testimony of the witnesses whom the State calls. That would include both the non-official witnesses, i.e. the victims and accomplice, as well as the non-fact police witnesses."

*Id.* at 11, 595 A.2d at 452–53. Given the need to "determine whether witnesses called by the State will start with a 'presumption of credibility' simply because of the positions occupied rather than the facts of the case," *id.* at 10, 595 A.2d at 452, the *Bowie* Court held, relying on what the *Langley* Court had done 14 years before, that the trial court erred in refusing to "address in *voir dire* the issue raised by the three questions proposed." *Id.* at 11, 595 A.2d at 453.

■ It is, of course, the case, that consistent with case law, the questions proposed must relate to uncovering bias that could arise, given the facts of the case. Accordingly, as a

prerequisite to asking the question, there must be a qualifying witness, one, who, because of occupation or category, may be favored, or disfavored, simply on the basis of that status or affiliation. Where, therefore, no police or other official witnesses will be called by the State, the occupational, or status, question need not be asked. On the other hand, if the case is one in which one or more police or official witnesses will be called to testify, the occupational witness question(s) must be asked, if requested. Similarly, if there are no defense witnesses, there will be no need for a Defense–Witness question. Where, however, there will be one or more defense witnesses, then it follows that the Defense–Witness question must be asked. Because the State always has the burden of proof and there usually will be State's witnesses, it seems clear, that in such cases, the State–Witness question always is also required. Of course, where there are defense and State witnesses, including police testimony, then the questions sanctioned in *Bowie* should be asked. The goal being to uncover any bias a venireperson might have towards a witness, an inquiry spanning category and status is necessary, where requested.

*Bowie,* therefore, did no more than reiterate the teachings of *Langley* and apply them. As we have seen, *Langley* accepted that, while questions related to a witness's occupation apply to police officers, their reach is not so narrow so as only to include police officers. *Bowie* merely reiterated, perhaps more expressly and pointedly, what *Langley* itself said, that any juror who, on the basis of status-based or party-based reasons, favors one witness over other witnesses is biased and should be disqualified. *Bowie,* 324 Md. at 11, 595 A.2d at 452–53.

The State argues that, because neither *Curtin v. State,* 393 Md. 593, 903 A.2d 922 (2006), nor *Stewart v. State,* 399 Md. 146, 923 A.2d 44 (2007), which adopted the *Curtin* formulation, in their listing of mandatory *voir dire* inquiries, cites *Bowie* as sanctioning any one of those inquiries and the Defense–Witness question is not one of the inquiries expressly mentioned, *Bowie* has been overruled or, in the alternative, the

Defense–Witness question is not one of the mandatory inquiries. This Court declines to accept either argument.

To be sure, this Court in *Curtin* did state that there are several areas of inquiry which, if reasonably related to the case before the court, a trial judge must ask the venire. In that case, we said:

"These areas are: race, ethnicity, or cultural heritage, *Hernandez v. State,* 357 Md. 204, 232, 742 A.2d 952, 967 (1999) ('Where a *voir dire* question has been properly requested and directed to bias against the accused's race, ethnicity, or cultural heritage, the trial court ordinarily will be required to propound such a question.'), religious bias, *Casey [v. Roman Catholic Arch.,* 217 Md. 595, 607, 143 A.2d 627, 632 (1958) ] ('[I]f the religious affiliation of a juror might reasonably prevent him from arriving at a fair and impartial verdict in a particular case because of the nature of the case, the parties are entitled to ... have the court discover them.'); in capital cases, the ability of a juror to convict based upon circumstantial evidence, *Corens [v. State,* 185 Md. 561, 564, 45 A.2d 340, 344 (1946) ] ('We ... hold that the State has the right to challenge a juror in a capital case on the ground that he would not be willing to convict on circumstantial evidence.'), and placement of undue weight on police officer credibility, *Langley v. State,* 281 Md. 337, 349, 378 A.2d 1338, 1344 (1977) ('[W]e hold that in a case such as this, where a principal part of the State's evidence is testimony of a police officer diametrically opposed to that of a defendant, it is prejudicial error to fail to propound a question such as ... whether any juror would tend to give either more or less credence ... [to a police officer].'); violations of narcotics law, [*State v. Thomas,* 369 Md. 202, 214, 798 A.2d 566, 573 (2002) ], (holding that trial judge abused his discretion in failing to ask question whether any jurors harbored strong feelings towards the violation of narcotics laws where defendant was charged with the possession and distribution of a controlled dangerous substance); strong emotional feelings with regards to alleged sexual assault against a minor, *Sweet [v. State,* 371 Md. 1,

10, 806 A.2d 265, 271 (2002) ] (holding that trial court abused its discretion in refusing to ask whether the charges of second degree assault and third degree sexual offense against a minor stirred up such strong emotional feelings that it would affect the veniremen's impartiality); *cf. Landon v. Zorn*, 389 Md. 206, 222, 884 A.2d 142, 151 (2005) (holding that trial judge did not abuse his discretion in refusing to ask proposed *voir dire* question regarding bias against plaintiffs in personal injury and medical malpractice cases because an affirmative answer to the proposed question would not constitute grounds for disqualification for cause)."

*Stewart*, 399 Md. at 162, n. 5, 923 A.2d at 53, n. 5, citing to and adopting the *Curtin*, 393 Md. at 609–610, n. 8, 903 A.2d at 932, n. 8, formulation.

The question of whether *Bowie* has been overruled can be answered simply—it has not been, neither *sub silentio* nor by virtue of a subsequent case in which the issue was raised and the Court so ordered. As to the latter, there clearly has been no such case and the State does not contend otherwise. With regard to the former, that *Bowie* was not cited by *Curtin* and *Stewart* is not dispositive. "This Court is not in the habit of overruling cases without stating that it intends to do so, and it is hardly conceivable that it would, without mentioning the fact, overrule so recent and important a case." *Hall v. Gradwohl*, 113 Md. 293, 301, 77 A. 480, 482 (1910); see also *id.* at 302, 77 A. at 482–483. ("It is stated in the motion 'that the failure of the Court in this case to notice the decision of *Cook v. Councilman*[, 109 Md. 622, 72 A. 404 (1909) ], above quoted, has [inconsistencies] in two related cases. . . .' We will merely say that the two cases were not identical, as asserted by the appellees; that the case of *Cook v. Councilman, supra*, was not overruled, nor was it intended to be overruled, and that nothing has been said in the opinion in this case in conflict with the familiar rule announced in that case."). Indeed, when this Court intends to overrule a case it tends to do so explicitly *see Mayor and City Council of Baltimore v. Schwing*, 351 Md. 178, 180, 717 A.2d 919, 919 (1998) ("To reach that result, we

shall revisit and overrule our holding in *Waskiewicz v. General Motors Corp.*, 342 Md. 699, 679 A.2d 1094 (1996).").

Likewise, when the Court declines to overrule a particular case after its viability is called into question, it also makes the declination clear. *See Pye v. State*, 397 Md. 626, 635, 919 A.2d 632, 637 (2007) ("Thus *Frazier[ v. State*, 318 Md. 597, 569 A.2d 684 (1990) ], which we decline to overrule, is controlling"); *Conteh v. Conteh*, 392 Md. 436, 438, 897 A.2d 810, 811 (2006) ("For the reasons hereafter set forth, we decline to overrule *Lookingbill[ v. Lookingbill*, 301 Md. 283, 483 A.2d 1 (1984) ] and we shall reverse the trial court's judgment."); *Plein v. DOL, Licensing & Reg.*, 369 Md. 421, 438, 800 A.2d 757, 768 (2002) ("Accordingly, although not the exact situation addressed in *Jones [v. State*, 362 Md. 331, 765 A.2d 127 (2001) ] and *Williams[ v. State*, 292 Md. 201, 438 A.2d 1301 (1981) ] we believe this case falls under that rule and, so, we will decline the parties' invitation to overrule *Total Audio–Visual[ Systems v. Dept. of Labor*, 360 Md. 387, 758 A.2d 124 (2000) ]."); *Jekofsky v. State Roads Com.*, 264 Md. 471, 472, 473, 287 A.2d 40, 41, (1972) ("The appellant, Charles S. Jekofsky, who was the plaintiff below, urges upon us that we should now overrule our prior holdings sustaining the doctrine of sovereign immunity in Maryland.... We fully considered both these attacks and our prior decisions in *Godwin v. County Commissioners of St. Mary's County*, 256 Md. 326, 260 A.2d 295 (1970) in which we declined to overrule our prior decisions sustaining the doctrine."); *Joseph v. Bozzuto Mgmt. Co.*, 173 Md.App. 305, 345, 918 A.2d 1230 (2007) ("It is inconceivable that the opinion, otherwise so up-front about its impact on existing law, would have presumed to overrule 70 years of well established Maryland law without so much as mentioning the fact and without giving any reasons for so tectonic a shift. If the Court, *sub silentio*, had undertaken to do any such thing, it is equally inconceivable that the close scrutiny of dissenting Judges Raker and Wilner would have failed to notice or comment upon so seismic an upheaval. Doctrinal earthquakes simply do not occur *sub silentio*, and none occurred in that case.").

We are satisfied that had this Court intended to overrule *Bowie*, it would have expressly done so, consistent with past practices and certainly for the purpose of providing guidance to the legal community on this issue.

In any event, the mere failure of a case to be cited in a subsequent opinion, even if the opinion addresses the very proposition for which the non-cited case stands, is not, and has never been, a basis for declaring an otherwise viable case overruled. A rule to the contrary would place an onerous, if not impossible, burden on appellate courts. Moreover, it would give to those courts a power they do not now have. As important, it could leave the question of the viability of a precedent, and the determination of its longevity, largely to fortuity; whether, by inadvertence or design, subsequent courts, and not the litigants, will decide whether a precedent survives. Such a rule, in addition, contradicts and negates practice. Even a cursory review of our opinions will reveal that citation of authority is not always exhaustive. Indeed, it need not be and it is not intended to be. To be sure, courts sometimes will endeavor to cite every case on an issue, but that usually is to show the issue to be well settled or to analyze the subject exhaustively. Citation to the seminal case, the leading case for the proposition under discussion, or the most recently decided case, ordinarily suffices and is what is done. That certainly is the case with *Langley*, 281 Md. at 347, 378 A.2d at 1343 ("Insofar as this particular type of question is concerned, we write on a clean slate.").

An analysis of the cases cited by *Curtin* and *Stewart* and the propositions for which they were cited demonstrate the point. The list *Curtin* developed, and adopted by *Stewart*, did not purport to list every *voir dire* case decided by this Court on the various *voir dire* questions. Being *voir dire* seminal cases, the same cases are cited for the mandatory inquiry that they announced for the first time. Other cases are added, therefore, only as the list of mandatory inquiries expands, only as this Court determines and holds that additional inquiries are mandatory. When, a subsequent case simply adopts the

reasoning of a seminal case and applies it, as this Court did in *Bowie*, that case, though subsequently decided, need not, and usually will not, be cited.

This point can be illustrated by considering this Court's treatment of the race, ethnic and cultural bias mandatory inquiry. *Hernandez v. State*, 357 Md. 204, 232, 742 A.2d 952, 967 (1999) is the leading case on this issue and, consequently, is consistently cited for that proposition. *See Stewart*, 399 Md. at 161, n. 5, 923 A.2d at 52, n. 5; *State v. Logan*, 394 Md. 378, 397, n. 2, 906 A.2d 374, 385, n. 2 (2006); *Curtin*, 393 Md. at 609, n. 8, 903 A.2d at 932, n. 8 (2006). On occasion, however, *see Owens v. State*, 399 Md. 388, 444, 924 A.2d 1072, 1105 (2007)(Raker, J., concurring); *see also State v. Thomas*, 369 Md. 202, 218, 798 A.2d 566, 575 (2002); *Dingle v. State*, 361 Md. 1, 11, n. 8, 759 A.2d 819, 824 n. 8 (2000), this Court will string cite to the cases on which *Hernandez* based its holding, namely, *Hill v. State*, 339 Md. 275, 661 A.2d 1164 (1995) (holding "[A]s a matter of Maryland nonconstitutional criminal law, that the refusal to ask a *voir dire* question on racial or ethnic bias or prejudice under the circumstances of this case . . . .") and *Bowie*, 324 Md. at 11, 595 A.2d at 453 ("[W]e hold that the trial court erred in refusing to address in *voir dire* the issue [of racial bias] raised by the three question proposed by appellant."). When this Court elects to cite only to *Hernandez* for the proposition that race, ethnicity and cultural bias questions must be asked. *Hill* and *Bowie* are not overruled because they are not mentioned. Similarly, just because *Bowie* was not cited by *Curtin* and *Stewart* does not mean it was overruled. As explained, the *Bowie* holding on *voir dire* is derived from *Langley*, which the Court determined "to be dispositive." *Bowie*, 324 Md. at 8, 595 A.2d at 451. Because *Bowie* was merely a reiteration and explication of an already settled precedent, citation to that precedent rendered citation to *Bowie* unnecessary.

The State further contends that, even if *Bowie* were not overruled, *Bowie* is still not applicable because the Court, in that case, "did not hold that [the third] question, standing alone, was mandatory in all cases." The State again bases its

argument on, and finds support for it from, the failure of *Stewart* and *Curtin* to cite *Bowie* in the list of mandatory *voir dire* inquires. We reject the premise that underlies the State's position, that any *voir dire* question not expressly mentioned in *Stewart* and *Curtin* is not mandatory.

The argument that *Bowie* did not hold that the Defense–Witness question was, standing alone and in all cases, mandatory is belied not only by what the Court said about that question, but also by what it did. It is true that the Court concluded that the three questions requested by the defendant were related; however, it did not suggest, much less state, that all three would have to co-exist before the category or affiliation questions could be asked. Just the opposite is the case. As we have seen, the Court noted two categories of concern with occupational, or status, witnesses and categorical, or affiliation, witnesses, one of which related to the dichotomy between State's witnesses and defense witnesses. Common to each of these categories was the predisposal of the venire, or some of them, to favor the testimony of one over the testimony of the other. It is significant that the State must always carry its burden and it must do so with witnesses. Consequently, it is inconceivable, from a reading of *Bowie,* that a State–Witness inquiry could be refused. It follows, therefore, that where there are defense witnesses to be called, the Defense–Witness question would also be required. That is all that is required, that where the issue exists, the question must be asked, if requested.

With regard to the significance of the fact that *Langley* was cited only for the proposition that questions relating to the tendency of the venire to favor police officers are mandatory, restricting or limiting the reference in a citation does not determine the scope of the case cited; if the case stands for a broader proposition, it is that proposition, not the restricted reference, that controls. Thus, while the citation to *Langley* in *Curtin* and *Stewart* was restricted, referencing only police officer testimony, the real question is, what does the case itself stand for? As we have seen, and as *Bowie* made clear, the case was not so restricted; it recognized that the bias con-

cerns were not just related to police offices, but extended to witness "occupations and categories" The reference in *Langley* to police officers, therefore, is simply shorthand for status and affiliation witnesses, as to whom inquiry into venire predisposition is mandatory.

**IV.**

 As a secondary matter, our precedents reflect that any question requested that is relevant to the facts or circumstances presented in a case which assists the trial judge in uncovering bias can, must, be asked. *See Thomas,* 369 Md. at 208, 798 A.2d at 569. ("Any circumstances which may reasonably be regarded as rendering a person unfit for jury service may be made the subject of questions and a challenge for cause."); *see also Casey,* 217 Md. at 605, 143 A.2d at 631 ("... the trial judge should adapt the questions to the needs of each case in the effort to secure an impartial jury."); *Corens,* 185 Md. at 564, 45 A.2d at 343 ("In other words, an examination a prospective juror on his *voir dire* examination is proper as long as it is conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him."). If a response to a requested *voir dire* question would not further the goal of *voir dire* and uncover bias among prospective members of the jury, it need not be asked and the court will not abuse its discretion in not doing so.

*Curtin* is illustrative. There, the Court had to decide whether the trial court erred in excluding the following question during *voir dire* examination:

"Does anyone have any strong feelings concerning the use of handguns that they would be unable to render a fair and impartial verdict based on the evidence?"

*Id.* at 597, 903 A.2d at 925. The Court held it did not. *Id.* at 595, 903 A.2d at 924. Quoting the intermediate appellate court. *Baker v. State,* 157 Md.App. 600, 853 A.2d 796 (2004), this Court stated:

"In this case ... potential juror bias about handguns does not go so directly to the nature of the crime. Appellant was

accused of robbing a bank with an accomplice who was brandishing a gun.... [N]o analysis or weighing of issues pertaining to the gun was required by jurors in this case.... The proposition that a juror's strong feelings for or against handguns would necessarily preclude him or her from fairly weighing the evidence in this case ... is based upon a transcendental line of reasoning with which we disagree. *Baker [v. State*, 157 Md.App. 600, 853 A.2d 796 (2004)] makes clear that a proposed voir dire question should not be probing or abstract, but should directly address potential jurors' biases, prejudices, and ability to weigh the issues fairly. The inquiry should focus on the venire person's ability to render an impartial verdict based solely on the evidence presented. Appellant's proposed voir dire question did not directly address a juror's ability to weigh the issues fairly or render an impartial verdict in this case."

*Id.* at 611–612, 903 A.2d at 933–934. The Court then distinguished that question from other questions which were included during the *voir dire* which "adequately addressed any potential issues of bias regarding the nature of armed robbery." *Id.* at 613, n. 10, 903 A.2d at 934, n. 10. *See also Stewart*, 399 Md. at 164, 923 A.2d at 54, 55 ("[n]one of appellant's questions that the judge refused to ask fell within the mandatory areas of inquiry," or "were reasonably likely to reveal cause for disqualification and none of them dealt specifically with the facts of the case, the crime, the witnesses, or appellant himself."). *Curtin,* therefore, focused on whether the requested *voir dire* question would assist in the pursuit of uncovering bias and, in that way, assist the court and counsel in selecting an unbiased jury.

Under that analysis, the Defense-Witness question is mandatory in cases, such as this one, because it falls within the very core of the purpose of *voir dire,* it is designed to uncover venireperson bias. The question specifically addresses whether a witnesses sponsored by the State would receive a " 'presumption of credibility' " in direct contravention to a defendant's right to a fair and impartial trial. *Voir dire,* as this

Court has held numerous times, is supposed to uncover bias and favoring one witness over another solely because of that witness's status or affiliation demonstrates bias. As addressed and resolved in *Bowie*, therefore, it is not enough to confine the inquiry to occupation, to assure a fair trial, it is necessary to extend the inquiry to whether a venireperson would also favor or disfavor a non-official witness, simply because of his or her status or affiliation with the State or the defense.

## V.

The petitioner submits that there are "staggering" implications should this Court hold either that the Defense–Witness question is not mandatory or, in the alternative, was not required to be given in this case. He reasons that such a holding would disrupt the well-settled Maryland law affirming the purpose of *voir dire*, to discover venirepersons who hold bias. It also would, the petitioner asserts, "necessarily imply that a witness who is predisposed to believe the State's witness over the defense witnesses is not subject to disqualification for cause." Citing *Curtin*, he notes that bias impairs a juror's "ability to render an impartial verdict based solely on the evidence presented." 393 Md. at 605, 903 A.2d at 929–30. This Court agrees.

The purpose of *voir dire* is to ensure and secure a defendant's right to a fair and impartial trial by permitting the selection of a jury comprised of venirepersons who do not hold preconceived notions or biases that would affect the outcome of the trial. As we have said, in pursuit of this goal, a trial court must question the venire and consider whether any of the answers reveals such a bias. *Curtin*, 393 Md. at 605, 903 A.2d at 929–30. Any question likely to elicit disqualifying information must be asked. Failure to do so taints the objectivity and thus impartiality of the jury, with negative implications for the defendant's right to a fair trial.

The holding in *Bowie* is dispositive of this case. This Court, in *Bowie*, 324 Md. 1, 595 A.2d 448, as we have seen, addressed the circumstances under which a Defense–

Witness *voir dire* question should be asked, concluding that, in cases in which there is a Defense–Witness and a Defense–Witness question is requested, the question must be asked during *voir dire* examination. This recognition that a defendant has the right to "determine whether witnesses called by the State will start with a 'presumption of credibility' simply because of the positions occupied rather than the facts of the case." *Bowie*, 324 Md. at 10, 595 A.2d at 452, is simply the reiteration of the proposition articulated in *Langley*, that a venireperson who would bestow credit to a witness because of the witness's *status* or party affiliation is no longer impartial and, therefore, may be disqualified for cause. *Langley*, 281 Md. at 348, 378 A.2d at 1343. Accordingly, we will affirm what we said there.

 In this case, as in *Bowie*, defense counsel properly submitted his request for *voir dire*, which included a State–Witness question, a Defense–Witness question and a police officer question. Although allowing the latter question, the trial court refused to ask the other two. That refusal, and specifically as to the Defense–Witness question, was error. This is so because the State called both official (police) and non-official (non-police) witnesses, the defendant called witnesses to testify for him and, despite the State's argument to the contrary, none of the other *voir dire* questions covered the substance of either the non-official State–Witness question nor the Defense–Witness question. First, *Bowie* held that all "three questions" are necessary. *Bowie*, 324 Md. at 11, 595 A.2d at 453. Moreover, general questions that delve into a venireperson's personal acquaintances or beliefs,[2] familial and personal relationship with, or to, crime, criminals and certain professions, while pertinent and necessary to uncover certain kinds of bias, simply do not suffice to uncover status or affiliation bias; they do not address, never mind resolve, the

---

2. The State also suggests that the Defense–Witness question is covered by: "Is there any member of the prospective jury panel who has any political, religious, or philosophical beliefs about your system of justice that you make you hesitate to sit as a juror in this case? We do not agree."

question of whether a venireperson would favor a particular witness or category of witness prejudicially. *Davis v. State,* 333 Md. 27, 31, 633 A.2d 867, 877 (1993) ("Merely asking general questions, such as, 'is there any reason why you could not render a fair and impartial verdict,' is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and impartially decide the case."). Finally, *Bowie* expressly rejected the argument that the Defense–Witness question is subsumed within the police officer question. 324 Md. at 7–8, 595 A.2d at 451. We made clear that, although related to questions involving official witnesses, that question spoke to an additional concern not to be "overlook[ed]." *Bowie,* 324 Md. at 11, 595 A.2d at 452.

The State argues, "any error in failing to ask Moore's requested *voir dire* questions was ultimately harmless beyond a reasonable doubt." To be sure, under the harmless error doctrine, not every error committed during a trial is reversible error. *Williams v. State,* 394 Md. 98, 120, 904 A.2d 534, 547 (2006)(Raker, J., dissenting). Where, however, a "reviewing court, upon its own independent review of the record, is [un] able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). *See also Williams v. State,* 394 Md. at 120, 904 A.2d 534 (2006)(Raker, J., dissenting) (quoting *McDonough Power Equip. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848–49, 78 L.Ed.2d 663, 670 (1984)) ("The harmless-error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial.").

In *Casey,* this Court stated the test:
"[P]arties to an action triable before a jury have a right to have questions propounded to prospective jurors on their *voir dire,* which are directed to a specific cause for disquali-

fication, and failure to allow such questions is an abuse of discretion constituting reversible error."

*Casey,* 217 Md. at 605, 143 A.2d at 631. *See Boyd v. State,* 341 Md. 431, 439, 671 A.2d 33, 38 (1996) ("If the question is not reasonably likely to reveal cause, such as the question Davis proposed, it will not be an abuse of discretion for the judge to refuse to ask it; if the question would be reasonably likely to reveal something disqualifying, such as plaintiff Casey's proposed question regarding biases towards or against the Roman Catholic Church, the judge who refuses to ask the question will abuse his discretion and commit reversible error.").[3]

---

**3.** The issue resolved in *Boyd v. State* was:

"is it an abuse of discretion for a trial judge to refuse a party's request that the judge ask on *voir dire* whether any of the prospective jurors has a physical impairment hindering his or her performance as a juror?"

341 Md. 431, 433, 671 A.2d 33, 34 (1996). Answering that question, we held:

"Under the common law of this State this Court will prescribe the juror *voir dire* process only as much *as is necessary* to establish that jurors meet minimum qualifications for service and to uncover disqualifying bias. Because Maryland statutory law requires that a thorough assessment of a juror's physical ability to serve take place at earlier stages in the jury selection process, we hold that such a question is not necessary and therefore not mandatory when requested at the *voir dire* stage. The refusal of the trial judge in each of the instant cases to ask such a question was not an abuse of discretion."

*Id.* at 433, 671 A.2d at 34. (emphasis in original). To be sure, in *Owens v. State,* 399 Md. 388, 422, 924 A.2d 1072, 1092 (2007), this proposition was overruled. We reasoned:

"The rule in *Boyd* that *voir dire* questions concerning minimum statutory qualifications are not mandatory when sought was animated, in part, by a belief that such questions duplicate needlessly the efforts of the pre-*voir dire* screening methods which focus on statutory disqualifications. That cases such as the present one occur demonstrate a correctable weakness in this reasoning. Because the pre-*voir dire* screening methods failed to identify and excuse Alade, a non-citizen, it is evident that *voir dire* questions regarding minimum statutory qualifications are not always 'redundant and unnecessary.' ... In fact, our cases ruminate that the pre-*voir dire* processes of screening out disqualified jurors are not fail-safe. *See supra* note.... We are persuaded, and so hold, that it is in the better interests of justice to require trial judges to pose *voir dire* questions directed at exposing constitutional and statutory disqualifications when request-

If there is an abuse of discretion, there is error and that error is reversible error. *State v. Logan,* 394 Md. at 396–397, 906 A.2d at 385; *Landon v. Zorn,* 389 Md. at 216–17, 884 A.2d at 148; *Dingle v. State,* 361 Md. at 18, 759 A.2d at 828 (quoting, *Davis v. State,* 333 Md. at 63, 633 A.2d at 885 (1993) (Bell, J., dissenting)); *Casey,* 217 Md. at 605, 143 A.2d at 631; *Thomas v. State,* 139 Md.App. 188, 197, 775 A.2d 406, 412 (2001). It is not, by definition, harmless.

In this case, the Defense–Witness question should have been asked of the venire. When the trial judge refused to ask it, he abused his discretion, committing reversible error.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY FREDERICK COUNTY.

MURPHY, J., concurring.

I am in complete agreement with the holding "that the trial court erred when it failed, upon the defendant's request to ask the Defense–Witness question during *voir dire.*" I write separately, however, to repeat two suggestions made in the concurring opinion I filed in *Curtin v. State,* 165 Md.App. 60, 884 A.2d 758 (2005), *aff'd,* 393 Md. 593, 903 A.2d 922 (2006). In my effort to reduce the chances that a conviction will be reversed on the ground that the defendant was entitled to a *voir dire* question that the Circuit Court refused to ask, I stated:

My first suggestion is that the circuit court resolve a "doubtful" and/or "marginal" *voir dire* question in favor of

---

ed by a party. Accordingly, we overrule *Boyd* to the extent that it conflicts with this holding."
There is no inconsistency between the proposition for which *Boyd* has been cited and the *Owens* holding.

the party who has requested that it be asked. In the case at bar, asking the question at issue would have resulted in a more efficient use of judicial resources.

My second suggestion is that the circuit court analyze a proposed *voir dire* question by applying a test that is derived from the (no longer permissible) "compound question" test articulated as follows in *Davis, supra,* 93 Md.App. at 121–22, 611 A.2d 1008:

> [A] compound question probing *both* A) the existence of a condition *and* B) the likely consequence of that condition has been deemed legally appropriate and required.

> \* \* \*

This general rule applies, whatever the particular subject matter may be. The variation consists of nothing more than filling in a blank with respect to Condition A. Condition A, of course, can be anything. "Are you now or have you ever been a member of [the American Red Cross, ... ]?" Component B is a constant. "... and would such condition make it impossible (or difficult) to return a fair and impartial verdict based only upon the evidence in this case?" An affirmative answer to Consequence B is always a ground for disqualification, whatever its cause.

A modification of this test is required because, in *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000), the Court of Appeals abolished the "compound question" rule. The modification, however, merely requires that there be (1) a *direct* inquiry into the existence of any condition the reason ably likely consequence of which would impair a prospective juror's ability to return a fair and impartial verdict based only upon the evidence presented in open court, and (2) as to any prospective juror who responds in the affirmative to that inquiry, appropriate "follow up" questions that focus upon the consequences of the particular condition.

\* \* \*

... When presented with a particular *voir dire* question, the trial judge should ask himself or herself, "does this question probe for a condition that would be likely to impair a juror's ability to decide this case on the evidence presented?" If the answer to that question is "yes," the question should be asked.

Had this test been applied in *State v. Thomas,* 369 Md. 202, 798 A.2d 566 (2002), the circuit court would have concluded that, in a case in which the defendant has been charged with selling drugs to an undercover officer, it is likely that a prospective juror's attitude about drugs would impair his or her ability to be fair and impartial. Had this test been applied in *Sweet v. State,* 371 Md. 1, 806 A.2d 265 (2002), the circuit court would have concluded that a defendant charged with the sexual child abuse of his girlfriend's eleven year old daughter was entitled to a *voir dire* question that asked the venire, "Do the charges stir up strong emotional feelings in you that would affect your ability to be fair and impartial in this case?" Had this test been applied in *Baker v. State,* 157 Md.App. 600, 853 A.2d 796 (2004), the circuit court would have concluded that, in an assault case involving the defenses of "self-defense" and "defense of others," it is likely that a prospective juror's attitude about handguns would impair his or her ability to be fair and impartial when deciding whether those defenses are available to a defendant who used a handgun to shoot the alleged victim. Had this test been applied in *Logan v. State,* 164 Md.App. 1, 882 A.2d 330 (2005), the circuit court would have concluded that, in a murder case in which the defendant has filed a plea of not criminally responsible by reason of insanity, it is likely that a prospective juror's attitude about the "insanity defense" would impair his or her ability to be fair and impartial.

165 Md.App. at 76–79, 884 A.2d at 767–769. (Murphy, C.J., concurring).

I am persuaded that, had this test been applied in the case at bar, the Circuit Court would have concluded that the Petitioner was entitled to a *voir dire* question directed at uncovering bias against witnesses for the defense.